UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/3/2023__
```

-----------------------------------------------------------------------X
                                            :

MURAT MORINA,                             :

                     Plaintiff,       :

                                   :          22-cv-02994 (LJL)

      -v-                       :

                                   :        OPINION AND ORDER

ALEJANDRO MAYORKAS, et al.,       :

                                   :

                    Defendants.     :

                                   :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      This case illustrates the precarious position of individuals admitted to the United States on the basis of asylum. Plaintiff Murat Morina ("Plaintiff" or "Morina") is a citizen of the former Yugoslavia, is of Albanian descent, and lived in what is now Kosovo. Dkt. No. 1 ¶¶ 5, 30, 65. In 1998, he allegedly joined the Liberation Democratic of Kosovo ("LDK") to protect himself and his way of life from violence perpetrated upon ethnic Albanians by Serbian nationals. A couple of times, he defended himself from attacks by Serbian forces at night. *Id.* ¶¶ 65, 66, 76. He also allegedly joined the Kosovo Liberation Army ("KLA"). *Id.* ¶ 17. At the time (and to date), neither the LDK nor the KLA had been designated as a terrorist organization by the United States Department of State. *Id.* ¶ 71. Morina was admitted to the United States approximately twenty-four years ago on the basis of his well-founded fear of persecution should he be returned to what is now Serbia, and he has resided in this country with his family since then with a stable job history and without any "trouble with law enforcement." Dkt. No. 23 ¶¶ 5–7; Dkt. No. 23 at ECF p. 23. In 2006, he applied for adjustment of status to that of lawful permanent resident, en route to potential citizenship. In 2021, however, the United States Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS")

denied Plaintiff's application for adjustment of status on the grounds that he was inadmissible for providing material support to terrorist organizations, namely, LDK and KLA.  Dkt. No. 23 ¶¶ 10–15; Dkt. No. 1 at ECF pp. 27–30.  He challenges that decision, as well as the denial of his corresponding motion to reopen and reconsider.

Defendants Merrick Garland, Alejandro Mayorkas, Ur M. Jaddou, Loren Miller, and Thomas Cioppa ("Defendants") now move to dismiss his complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 9.  For the reasons that follow, that motion is granted.

## BACKGROUND

### I.    Statutory and Regulatory Background

After a foreign national has been granted asylum and been physically present in the United States for one year, the foreign national may apply for adjustment of status to lawful permanent resident.  8 U.S.C. § 1159(b).  The decision whether to adjust the status of a noncitizen granted asylum to that of lawful permanent resident resides in the discretion of the Secretary of Homeland Security and the Attorney General of the United States and there is no specific time frame within which USCIS must adjudicate an application.  *Id.*; 8 C.F.R. § 209.2. Section 209(b) of the INA states in pertinent part:

> The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who –
>
> 1. applies for such adjustment,
>
> 2. has been physically present in the United States for at least one year after being granted asylum,

3. continues to be a refugee within the meaning of [INA] section 101(a)(42)(A) of this title or a spouse or child of such a refugee,

4. is not firmly resettled in any foreign country, and

5. is admissible (except as otherwise provided under subsection (c) of this section) as an immigrant under this chapter at the time of examination for adjustment of such alien.

8 U.S.C. § 1159(b).  The decision to adjust the status of a foreign national is often described as resting upon a two-part inquiry:  first, whether the foreign national is eligible for adjustment of status (which includes an inquiry into admissibility and whether she has been in the United States for at least one year); and second, if so, whether the foreign national warrants a favorable exercise of discretion.  *Id.*

Section 212(a)(3)(B) of the INA, as amended by the REAL ID Act of 2005, contains the bases upon which a noncitizen may be deemed inadmissible under the first step of this inquiry. It states in part that "[a]ny alien who – (I) has engaged in a terrorist activity . . . is inadmissible." *Id*. § 1182(a)(3)(B).  Section 212(a)(3)(B)(iv) provides that an individual has "engage[d] in terrorist activity" when he or she "commit[s] or … incite[s] to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity."  *Id.* § 1182(a)(3)(B)(iv)(I).  An individual also "engage[s] in terrorist activity" if she commits an act that she "knows, or reasonably should know, affords material support . . . to a terrorist organization . . . or to any member of such an organization."  *Id.* § 1182(a)(3)(B)(iv)(VI).

The term "terrorist organization" is defined to include three tiers of organizations.  The first tier are those organizations "designated under section 1189 of this title."  *Id.* § 1182(a)(3)(B)(vi)(I).  The second tier are those organizations "designated . . . by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in"

certain activities.  *Id.* § 1182(a)(3)(B)(vi)(II).  The third tier ("Tier III") includes a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activity.  *Id.* § 1182(a)(3)(B)(vi)(III); *see also id.* § 1182(a)(3)(B)(iii) (defining terrorist activity); *id.* § 1182(a)(3)(B)(iv) (defining "engage in terrorist activity"). "Terrorist activity" is defined to include "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  *Id.* § 1182(a)(3)(B)(iii)(V).  Thus, if a group of two or more individuals engages in the "use of any—explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," the organization may be deemed a Tier III terrorist organization.  *Id.* § 1182(a)(3)(B)(vi)(III); *see also id.* § 1182(a)(3)(B)(iii); § 1182(a)(3)(B)(iv).

The Secretary of State and the Secretary of Homeland Security, after consultation with the Attorney General, may make certain exemptions from the terrorism-related inadmissibility grounds.  *See id.* § 1182(d)(3)(B)(i).  "Such consultation includes the vetting of Tier III groups regarding their backgrounds and actions, as well as consideration of national security, humanitarian, and foreign policy concerns"; "[t]his deliberative process is lengthy."  *Jamal v. Johnson*, 2016 WL 4374773, at *3 (C.D. Cal. Aug. 15, 2016).  The decision to grant a terrorism exception under § 1182(d)(3)(B)(i) is in the Secretary of State's and Secretary of Homeland Security's "sole unreviewable discretion."  8 U.S.C. § 1182(d)(3)(B)(i).  The statute also provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review such a determination or revocation except in a proceeding

4

for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D)." *Id.*

## II.      **Factual Background**

Plaintiff was a citizen of the former Yugoslavia and a former resident of what is now Kosovo.[1] Dkt. No. 1 ¶¶ 5, 30.  He is also an ethnic Albanian.  *Id.* ¶ 65.  In 1998, during the Kosovo war, he was allegedly a member of the LDK, a political party or movement created for the express purpose of peacefully resisting the Serbian occupation of Kosovo and the persecution of ethnic Albanians by the Serbians.  *Id.* ¶¶ 65, 76.  As such, he was forced to take up arms to protect himself and his family from the violence perpetrated upon ethnic Albanians by the Serbians.  *Id.* ¶ 65.  A couple of times, he was forced to defend himself from attacks by Serbian forces at night.  *Id.* ¶ 66.  At the time, the geographic area of Kosovo was a war zone and Serbians were brutally raping, killing, and torturing ethnic Albanians.  *Id.* ¶ 79.  The KLA is an organization that was started in the early 1990s and was supported by both the United States and NATO; its intended purpose was to push back against Serbia.  *Id.* ¶ 82.[2]  Members of the KLA battled Serbian authorities who were slaughtering individuals in Kosovo.  *Id.* ¶ 89.  Neither the KLA nor the LDK have been declared a terrorist organization by the U.S. Department of State. *Id.* ¶ 71.

Plaintiff entered the United States on July 14, 1998, after having been persecuted by the Serbians, *id.* ¶ 5, and applied for asylum, withholding of removal, and protection under the Convention Against Torture, *id.* ¶ 6.  On April 5, 1999, he was granted asylum.  *Id.* ¶ 7; *id.* at ECF p. 84.

---

[1] The Court accepts the well-pleaded allegations of the complaint as supplemented by the documents incorporated by reference as true for purposes of this motion.
[2] The United States Central Intelligence Agency provided funding for the KLA and Plaintiff alleges that "in 1999, NATO intervened on behalf of the KLA and supported it."  *Id.* ¶¶ 83–84.

Plaintiff filed an application for Adjustment of Status and was interviewed on July 14, 2006. *Id.* ¶ 10. A long period of delay ensued. *Id.* ¶ 11. His lawyer wrote to USCIS on January 16, 2007, June 4, 2007, October 5, 2007, May 28, 2008, February 5, 2009, and January 11, 2010, complaining about the delay in adjudicating his case as well as that of his wife and his minor child. *Id.* at ECF pp. 86–91.[3] In 2018, after Plaintiff's case had been pending for twelve years, his lawyer sent a series of additional letters to USCIS inquiring about the status of the matter. *Id.* at ECF pp. 92–97. In the course of the correspondence, his lawyer threatened that if the case was not adjudicated, Plaintiff would be forced to file an application for a writ of mandamus. *Id.* at ECF p. 93.

On October 24, 2018, after the last of counsel's letters had been sent on October 12, 2018, *id.* at ECF p. 98, USCIS issued a Notice of Intent to Deny ("NOID") on the grounds that (i) Plaintiff was inadmissible under the Immigration and Nationality Act ("INA") § 212(a)(3)(B)(i)(I) as defined by INA § 212(a)(3)(B)(iv)(VI)(dd) for providing material support to the KLA by serving as a solider; and (ii) that he was inadmissible under INA § 212(a)(3)(B)(iv)(I) because he fought against and fired weapons at Serbian forces for the KLA. *Id.* ¶¶ 13–14; *id.* at ECF pp. 99–101. The NOID recited USCIS's findings to support that KLA was engaged in terrorist activity including that it was "an underground movement organized by Kosovar Albanian militants, which began carrying out armed attacks against Serbian police in 1995"; that in 1996, it "undertook a series of attacks against police stations and Yugoslav government officers, saying that they had killed Albanian civilians as part of an ethnic cleansing campaign"; that "[s]ince 1997 the KLA conducted attacks on Serbian police, other officials, and Albanians who collaborated with Serbian authorities"; that it "was responsible for serious abuses

---

[3] Murat's wife's case apparently was adjudicated on February 4, 2009. Dkt. No. 1 at ECF p. 90.

in 1998, including abductions and murders"; and that it had "engag[ed] in military tactics in 1998 and 1999 that put civilians at risk." *Id.* at ECF p. 100.  The NOID stated with respect to Plaintiff:

> You stated in the affidavit accompanying your Form I-589, Application for Asylum, that in April 1998, you became a member of the Kosovo Liberation Army (KLA) and fought as a soldier on their behalf.  You stated that you did everything, including giving food and caring for the sick.  You stated that you used guns and fought directly with the Serbians alongside your father.  When asked, "Did you fire or kill any Serbians or wound any Serbians?" You responded, "As far as I could remember or could see, I never kill[ed] any Serbians, because the fights were always at night."  You stated that you left the fighting to find your pregnant wife and child.  After you reunited with your family, you traveled to the German border. You and your family came to the United States on July 14, 1998.

*Id.*

Plaintiff responded in November 2018 that he was not a member of the KLA and he did not provide material support to it.  *Id.* ¶ 17; *Id.* at ECF pp. 60–61.

On March 23, 2021, USCIS issued the instant denial.  *Id.* at ECF pp. 57–63.  USCIS started by detailing the facts that led it to conclude that the KLA and LDK met the broad definition of Tier III terrorist organizations.  *Id.*  USCIS then described the facts that led it to conclude that Plaintiff had provided material support to these organizations.  *Id.*  In doing so, USCIS rejected Plaintiff's claim in response to the NOID that he never fought for the KLA as not credible in light of his statements in his asylum application that he became a soldier for the KLA in April 1998 and decided to fight the Serbians to protect his right to live and his way of life. *Id.* at ECF pp. 58, 61.  It also rejected Plaintiff's argument that his status should be adjusted because his asylum application had been granted:

> Your grant of asylum by an Immigration Judge on April 5, 1999 and the current adjudication of your Application to Adjust Status are separate decisions.  In order to adjust status under INA § 209(b), you must be admissible at the time of examination for adjustment of status.  The decision on your Application to Adjust Status is not bound by the decision on your prior benefit adjudication.

*Id.* at ECF p. 61.  USCIS acknowledged that the Secretary of Homeland Security had exercised her discretion not to apply some terrorism-related inadmissibility grounds to noncitizens relating to the KLA but found that those exemptions did not apply to Plaintiff because "you fought as a combatant and fired your weapon with the intent to either directly or indirectly, cause death or endanger the safety of one or more individuals."  *Id.*

Based on these findings, USCIS reached the conclusion that he was inadmissible for adjustment of status based on his membership in the LDK and for providing material support to that organization.  *Id.* at ECF pp. 57–63.  Specifically, USCIS concluded that Plaintiff was inadmissible under INA § 212(a)(3)(B)(i)(I) for engaging in terrorist activity as defined by INA § 212(a)(3)(B)(iii)(V)(b), when, as a solider for LDK, he fired his weapon to endanger the safety of one or more individuals and under INA § 212(a)(3)(B)(iv)(VI)(dd) for providing material support to a terrorist organization.  *Id.*  It also concluded that Plaintiff would be ineligible for admission because he did not fully disclose in all relevant applications and interviews with the U.S. government his associations with the KLA.  *Id.*

USCIS then separately found that Plaintiff's adjustment of status "should be denied as a matter of discretion."  *Id.* at ECF p. 62.  Specifically, USCIS stated:

> You further stated in your NOID response that you and your family have been in the United States for 20 years.  You have never been in trouble with law enforcement.  You have always worked with a stable job history.
>
> The nearly 20 years you have spent in the United States and the fact that you have family members who reside here are positive factors in your case.  However, any positive factors are outweighed by your close association with, and support for a terrorist organization.  After careful review of all the facts, USCIS has determined that the positive factors do not outweigh the negative factors and that your application for adjustment of status should be denied as a matter of discretion in addition to the statutory ineligibility cited above.

*Id.*

On June 11, 2021, Plaintiff filed a Form I-290B, Notice of Appeal or Motion, seeking to have USCIS reopen and reconsider its denial of his application for adjustment of status. *Id.* at ECF p. 23. On December 14, 2021, USCIS denied Plaintiff's motion to reopen and reconsider. *Id.* In rejecting Plaintiff's arguments, USCIS focused on Plaintiff's activities on behalf of LDK. It stated:

> The violent activities of the KLA and LDK meet the definition of 'terrorist activities' and 'engaging in terrorist activities' as defined in INA sections 212(a)(3)(B)(iii) and 212(a)(3)(B)(iv), including the use of explosives, firearms, or other weapons or dangerous devices (other than for mere personal monetary gain), with the intent to endanger the safety of one or more individuals or to cause substantial damage to property. Therefore, the KLA and LDK fall within the definition of an undesignated terrorist organization under INA section 212(a)(3)(B)(vi)(III) at the time you were associated with them. . . . Your own statements indicate that you were an armed soldier for LDK fighting directly against the Serbians. You stated that you and your father fought against the Serbians using guns. Accordingly, you were directly involved in the violent activities of the LDK, which form the underlying basis for the determination that the LDK meet the definition of a Tier III organization. . . . The fact that you were fighting for the LDK, which met the definition of a Tier III organization at the time of your involvement, establishes that your activity was unlawful under the laws of the place where it was committed because the LDK were engaged in armed combat with the Serbian armies.

*Id.* at ECF pp. 24–25.

In response to Plaintiff's argument that the U.S. government supported LDK and KLA, USCIS stated that the statutory definition for terrorist group was determined by the activities of the group and "does not provide an exception for groups allied with and/or supported by the United States." *Id.* at ECF p. 24. Finally, USCIS noted: "This motion is not accompanied by new evidence. This motion also does not provide pertinent precedent decisions to consider; nor does it establish that the decision was incorrect based upon the evidence of record at the time." *Id.*

## PROCEDURAL HISTORY

Plaintiff filed his complaint in this Court on April 12, 2022.  Dkt. No. 1.  Plaintiff brings his claims under the Administrative Procedure Act ("APA") and seeks de novo review of USCIS's decision denying his application for adjustment of status and an order compelling USCIS to reopen and reissue a new decision on the application.  *Id.* at ECF pp. 1–2.  He alleges that USCIS acted arbitrarily and capriciously, abused its discretion, and erred as a matter of law when it denied the application on the grounds that he is inadmissible under INA § 212(a)(3)(B)(i)(I).  *Id.*

Specifically, Plaintiff alleges that he is not inadmissible under the grounds alleged by USCIS.  *Id.* ¶ 24.  He alleges that LDK is not a terrorist entity but a movement or political party to liberate Kosovo and that he "was not a soldier in [the] way that the officer is stating," but rather was "forced to take up arms to protect himself and his family from the violence perpetrated upon ethnic Albanians by the Serbians."  *Id.* ¶¶ 64–65.  He also alleges that KLA and LDK are not "Tier III entit[ies]" and therefore any support he gave to them should not be deemed material support for a terrorist entity.  *Id.* ¶¶ 69–70, 76–79, 80–92.  He further suggests that the NOID was issued as a reprisal for his threat to file a petition for a writ of mandamus, *id.* ¶¶ 11–13, 47–48, and that the USCIS's determination that he was inadmissible based on his activities with LDK and KLA is inconsistent with the asylum officer's decision to grant him asylum, as such relief could not have been granted had the officer found he was a member of a terrorist organization.  *Id.* ¶ 9.

On June 21, 2022, Defendants filed the instant motion to dismiss along with a supporting memorandum of law.  Dkt. Nos. 9–10.  Plaintiff filed a memorandum in opposition on September 12, 2022.  Dkt. No. 15.  On September 19, 2022, Defendants filed a reply

memorandum in further support of their motion to dismiss.  Dkt. No. 16.  Defendants filed a

letter of supplemental authority on September 26, 2022.  Dkt. No. 17.

## LEGAL STANDARD

A court properly dismisses a claim for lack of subject matter jurisdiction under Federal

Rule of Civil Procedure 12(b)(1) when it "lacks the statutory or constitutional power to

adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–

17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "A

plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the

evidence that it exists." *Makarova*, 201 F.3d at 113.  "A motion to dismiss for lack of subject

matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge

based on extrinsic evidence.'" *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859

F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*,

932 F. Supp. 94, 95 (S.D.N.Y. 1996)).  If the defendant is challenging the legal sufficiency of a

complaint's allegations, all factual allegations must be treated as true and all reasonable

inferences must be drawn in favor of the complaining party.  *See Robinson v. Gov't of Malay.*,

269 F.3d 133, 140 (2d Cir. 2001).  However, where the jurisdictional challenge is fact-based, the

defendant may "proffer[ ] evidence beyond the [p]leading," and the plaintiff "will need to come

forward with evidence of [its] own to controvert that presented by the defendant 'if the affidavits

submitted on a 12(b) motion . . . reveal the existence of factual problems' in the assertion of

jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exch.

Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  In that case, "no

presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden

is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Guadagno*, 932

F. Supp. at 95.

## DISCUSSION

Defendants argue that the complaint should be dismissed because the Court lacks subject matter jurisdiction under 8 U.S.C. § 1252(a)(2)(B).  Section 1252(a)(2)(B) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B).  Clause (ii) of Section 1252(a)(2)(B) refers to "decisions[s] or action[s] of the Attorney General or the Secretary of Homeland Security" that are "in the discretion of the Attorney General or the Secretary of Homeland Security."  *Id*.

Here, Plaintiff applied for adjustment of status under 8 U.S.C. § 1159(b).  That provision states that "[t]he Secretary of Homeland Security or the Attorney General" "may adjust to the status of" a foreign national granted asylum "in the Secretary's or the Attorney General's discretion."  *Id*. § 1159(b).  In other words, the decision to adjust the status of a foreign national granted asylum under 8 U.S.C. § 1159(b) is "in the discretion of the Attorney General or the Secretary of Homeland Security."  *Id*. § 1252(a)(2)(B)(ii).  Accordingly, by its plain terms, the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(B)(ii) bars this Court from reviewing USCIS's ultimate discretionary decision to deny Plaintiff relief under 8 U.S.C. § 1159(b).  *See Cruz-Miguel v. Holder*, 650 F.3d 189, 193 (2d Cir. 2011) ("Federal courts lack jurisdiction to review a discretionary denial of adjustment of status."); *Ling Yang v. Mukasey*, 514 F.3d 278, 279 (2d Cir. 2008); *Rodriguez v. Gonzales*, 451 F.3d 60, 62 (2d Cir. 2006).

In this case, however, Plaintiff's does not only challenge the discretionary decision of USCIS not to grant his request for adjustment of status.  Plaintiff also challenges USCIS's antecedent determinations that LDK and KLA are Tier III terrorist organizations and that he provided material support to them, which resulted in Plaintiff being deemed ineligible for relief under 8 U.S.C. § 1182(a)(3)(B).  Dkt. No. 1 ¶¶ 64–65, 69–70, 76–79, 80–92.  As noted, 8 U.S.C. § 1182(a)(3)(B) states in part that "[a]ny alien who – (I) has engaged in terrorist activity . . . is inadmissible" for adjustment of status, 8 U.S.C. § 1182(a)(3)(B); *see also id.* § 1159(b), and then goes on to define what it means to engage in "terrorist activity," *id.* § 1182(a)(3)(B)(iv); *id.* § 1182(a)(3)(B)(vi).  Thus, the question remains whether 8 U.S.C. § 1252 also bars this Court from reviewing this seemingly non-discretionary factual conclusion, which resulted in Plaintiff being deemed ineligible for discretionary relief in the first place.[4]

The Supreme Court recently addressed this question in *Patel v. Garland*, 142 S. Ct. 1614 (2022).  In that case, the petitioner applied to USCIS for adjustment of status under 8 U.S.C. § 1255(i).  *Id.* at 1619.  While his application was pending, the petitioner applied for a driver's license and checked a box stating that he was a United States citizen.  *Id.*  USCIS denied petitioner's application because of that misrepresentation, finding him statutorily ineligible for adjustment of status under § 1182(a)(6)(C)(ii)(I), which renders inadmissible an "alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under" state or federal law.  *Id.* at 1620 (quoting 8 U.S.C.

---

[4] To the extent Plaintiff seeks to challenge legal conclusions, Plaintiff must do so in compliance with 8 U.S.C. § 1252(a)(2)(D).  That section provides that: "Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."  8 U.S.C. § 1252(a)(2)(D).

§ 1182(a)(6)(C)(ii)(I)).  Years later, DHS initiated removal proceedings against the petitioner,

and he once again applied for adjustment of status and raised the question of whether the

misrepresentation of citizenship on his driver's license application rendered him ineligible for

discretionary adjustment.  *Id.*  "He conceded that he had checked the 'citizen' box on that

application" but claimed he had done so by accident.  *Id.*  The Immigration Judge ("IJ") found

petitioner's testimony not credible and denied petitioner's application; the IJ's decision was

upheld on appeal by both the BIA and the Eleventh Circuit.  *Id.* at 1620–21.  In rejecting his

request to overturn the decision of the IJ, the Eleventh Circuit, hearing the case en banc, held that

§ 1252(a)(2)(B)(i) precluded review of the IJ's factual determinations that he had not made an

honest mistake on the form.  *Id*.

   The Supreme Court affirmed, holding that "any and all decisions relating to the granting

or denying of discretionary relief," including "factual findings," fall within § 1252(a)(2)(B)(i)'s

prohibition on judicial review.  *Id.* at 1627 (cleaned up).  Focusing on Congress's use of the word

"judgment" in connection with subclause (i), the Supreme Court held that the provision

encompassed any and all decisions relating to the granting or denying of discretionary relief,

including the review of factual findings as part of discretionary-relief proceedings.  *Id.* at 1621–

23.  The Court held that by referring to "any judgment" regarding the granting of relief under

§ 1255 and other enumerated provisions, Congress signaled an intent to preclude review of

"judgments" "of whatever kind" under § 1255, "not just discretionary judgments or the last-in-

time judgment."  *Id.* at 1262.  In its view, "judgments" captured both decisions that were

subjective or evaluative and those that are objective—either would count as a judgment.  *Id.*

   In reaching its conclusion, the Supreme Court rejected the petitioner's argument that

§ 1252(a)(2)(B)(i) does not bar courts from reviewing factual determinations as to the person's

statutory eligibility for relief. *Id.* at 1625. Specifically, petitioner argued that "[e]ligibility determinations—which [petitioner] characterizes as 'first-step decisions'—are not judgments regarding the granting of relief because eligibility is a necessary but insufficient condition for relief" and the "only judgment that can actually grant relief is what Patel describes as the 'second-step decision' whether to grant the applicant the 'grace' of relief from removal." *Id.* (citation omitted). The Court disagreed, noting that the interpretation could not be squared with the text of the provision: "To be sure, the reference to 'the granting of relief' appears to constrain the provision from sweeping in judgments that have nothing to do with that subject. But as even the Government acknowledges, § 1252(a)(2)(B)(i) does not stop at just the grant or denial of relief; it extends to any judgment 'regarding' that ultimate decision." *Id.*

The Supreme Court acknowledged that its interpretation of "§ 1252(a)(2)(B)(i) would arbitrarily prohibit review of some factual determinations made in the discretionary-relief context that would be reviewable if made elsewhere in removal proceeding." *Id.* at 1626. For example, it noted:

> the question whether Patel intended to falsely claim to be a citizen on his driver's license application relates to whether he is statutorily inadmissible, which is both an obstacle to discretionary relief and an independent ground for removal. Presumably because Patel openly acknowledged that he was removable for entering the country illegally, the Government did not premise his removal on the contested claim that he had intentionally misrepresented his citizenship. But if the Government had taken that route, the Immigration Judge's determinations would have been reviewable in the ordinary course.

*Id.* However, the Supreme Court stated that the distinction was not "arbitrary" as it "reflected Congress' choice to provide reduced procedural protection for discretionary relief, the granting of which is not a matter of right under any circumstances, but rather is in all cases a matter of grace." *Id.* (cleaned up).

This case, however, presents two questions not expressly addressed by *Patel v. Garland*: (1) does *Patel v. Garland*, which arose in the context of a challenge to the petitioner's removal from the United States, also apply to USCIS decisions regarding the adjustment of status outside the removal context; and (2) does its broad construction of the term "judgment" entrusted to the discretion of the Attorney General or the Secretary of Homeland Security as used in subclause (i) of § 1252(a)(2)(B) to encompass antecedent questions of statutory eligibility apply with equal force to a "decision or action" under subclause (ii)?

The Supreme Court clearly signaled the answer to the first question.  The petitioner and the Government in *Patel* argued that the Court's broad interpretation of § 1252(a)(2)(B)(i) would "have the unintended consequence of precluding all review of USCIS denials of discretionary relief."  *Id.* at 1626.  The Court noted:

> Those decisions are made outside of the removal context, and subparagraph (D) preserves review of legal and constitutional questions only when raised in a petition for review of a final order of removal. If the jurisdictional bar is broad and subparagraph (D) is inapplicable, [petitioner] and the Government say, USCIS decisions will be wholly insulated from judicial review.

*Id.*  The Court stated that "[t]he reviewability of such decisions is not before us, and we do not decide it," but it then went on to state that "it is possible that Congress did, in fact, intend to close that door."  *Id.*  It continued that Congress "expressly extended the jurisdictional bar to judgments made outside of removal proceedings at the same time that they preserved review of legal and constitutional questions made within removal proceedings."  *Id.*  It then speculated that "foreclosing judicial review unless and until removal proceedings are initiated would be consistent with Congress' choice to reduce procedural protections in the context of discretionary relief."  *Id.* at 1626–27.

That the majority's opinion in *Patel* would preclude all review of USCIS denials of discretionary relief was precisely Justice Gorsuch's takeaway from the decision in his dissent bemoaning the majority's broad application of the statute.  He wrote:

> individuals frequently seek to adjust their status and secure a green card *outside* the removal context.  And when the government rejects an application for adjustment of status in these cases, individuals routinely seek judicial review in *district court*.  There, subparagraph (D) does not apply to preserve review of legal and constitutional questions.  So under the majority's construction of subparagraph (B)(i), individuals who could once secure judicial review to correct administrative errors at step one in district court are now, after its decision, likely left with no avenue for judicial relief *of any kind*.  An agency may err about the facts, the law, or even the Constitution and *nothing* can be done about it.

*Id.* at 1636 (Gorsuch, J., dissenting).

Unsurprisingly, although *Patel* was decided in the context of a removal proceeding, courts have construed the Supreme Court's broad language to preclude district court review of *any* non-discretionary adjustment-of-status eligibility determinations including those made by USCIS outside of the removal context.  *See Rabinovych v. Mayorkas*, 2022 WL 3908951, at *5 (D. Mass. Aug. 31, 2022) (collecting cases).  Indeed, it is difficult to square any other conclusion with the language at the beginning of 18 U.S.C. § 1252(a)(2)(B) that courts shall not have jurisdiction to hear the cases enumerated in subclauses (i) and (ii) "regardless of whether the judgment, decision, or action is made in removal proceedings."  If either of these provisions was intended to apply only in removal proceedings, there would have been no need for Congress to state that it applied regardless of whether the judgment was reached in a removal proceeding. The Court thus agrees with these courts and holds that *Patel*'s holding applies regardless of whether removal proceedings have been commenced.

As to the second question, this Court is unable to identify any basis for concluding that *Patel*'s broad construction of clause (i) should not equally apply to clause (ii) of § 1252(a)(2)(B). In reaching this conclusion, the Court starts with the statutory text.  Based on its position and its

introductory language, subclause (ii) appears designed to ensure that statutory decisions and actions similar in type to the ones listed in subclause (i) are also barred from judicial review. Subclause (ii), which comes directly after subclause (i), starts with the phrase "*any other* decision or action."  18 U.S.C. § 1252(a)(2)(B) (emphasis added).  The phrase "any other" following the enumerated statutory provisions in subclause (i) signifies that it operates as a catchall provision, the purpose of which is to ensure that categories of things similar in type to those specifically enumerated are covered.  *See Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1791 (2022) (finding that phrase beginning "any other class of workers" in a different statute was a "catchall category" intended to cover workers similar in type to those specifically enumerated directly prior).  In fact, this interpretation of (ii) as a "catchall provision" is consistent with how the Supreme Court has previously described the provision.  In *Kucana v. Holder*, 558 U.S. 233 (2010), the Court stated "[t]o the clause (i) enumeration of administrative judgments that are insulated from judicial review, Congress added in clause (ii) a catchall provision." *Id.* at 245. The Supreme Court counseled that these provisions should be interpreted as covering similar types of judgments: "The proximity of clauses (i) and (ii), and the words linking them—'any other decision'—suggests that Congress had in mind decisions of the same genre, *i.e.*, those made discretionary by legislation." *Id.* at 246–47.  Because of its intended catchall nature, it would make little sense to hold that the types of decisions that are insulated from review under (ii) are narrower than those insulated from review under subclause (i).

This conclusion is further supported by other aspects of the statutory text of clause (ii). While subclause (i) states that "no court shall have jurisdiction to review" "any *judgment*," subclause (ii) states that "no court shall have jurisdiction to review" "any other *decision or action*." 18 U.S.C. § 1252(a)(2)(B) (emphasis added).  The words "decision or action" are at

least as broad, if not broader, than the word "judgment" in subclause (i).  The word "judgment,"
although often used interchangeably with the word "decision," may alternatively refer only to the
"final decision of a court."  *Patel v. United States Att'y Gen.*, 971 F.3d 1258, 1274 (11th Cir.
2020) (surveying dictionary definitions of the term "judgment"), *aff'd sub nom. Patel*, 142 S. Ct.
1614.  That the word "judgment" has a potentially narrower meaning than the word "decision"
was recognized by the Eleventh Circuit in *Patel*.  In that case, the en banc court conducted a
survey of definitions of the word "judgment" and found that "[t]hese definitions fall into one of
two camps: either judgment means the final decision of a court, such as a sentence, or it is broad
and means any decision."  *Id.*  In holding that a broad understanding of "judgment" in provision
(i) was the correct one, the court stated that "[a]ny decision is the better fit, because the statutory
language is not limited to a final judgment of removal, but rather 'any judgment' regarding the
five enumerated categories of relief."  *Id.*

There is also no inconsistency between the Court's holding in *Patel*—*i.e.*, that
nondiscretionary factual findings fall under the bar on judicial review in § 1252(a)(2)(B)—and
subclause (ii)'s explicit reference to "discretion."  Subclause (ii) states that "no court shall have
jurisdiction to review . . . any other decision or action . . . *the authority for which is specified
under this subchapter to be in the discretion of the Attorney General or Secretary of Homeland
Security*."  18 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).  Importantly, provision (ii) does not
require the "decision or action" itself be discretionary.  It does not, for example, state that "no
court shall have jurisdiction to review any other *discretionary decision or action*."  Rather, it
"strips courts of the jurisdiction to review decisions that *are statutorily specified to be in the
discretion* of the Attorney General or the Secretary of Homeland Security."  *Patel*, 971 F.3d at
1272 (emphasis added).  Here, USCIS's decision as to whether Plaintiff materially supported

terrorist activities was not a discretionary decision.  However, in making this decision, USCIS

acted under the authority contained in 8 U.S.C. § 1159(b), which provides that the decision

whether to adjust the status of a noncitizen granted asylum resides in the discretion of the

Secretary of Homeland Security and the Attorney General of the United States.  *Id.*  This

preliminary eligibility determination would thus seem to be covered by subclause (ii)'s plain

language.

       Based on the statutory text, this Court finds no reason why *Patel*'s holding barring review

of factual questions as to a party's eligibility for adjustment of status under subclause (i) of

§ 1252(a)(2)(B) should not apply with equal force to subclause (ii).  For the reasons outlined,

subclause (ii), if anything, is best read as covering a broader swath of decisions and actions than

subclause (i).  This Court also cannot discern any practical reason for why Congress would have

wanted to limit judicial review for certain categories of immigrants moving for adjustment of

status to a different degree than others.  *See Patel*, 142 S. Ct. at 1626 (noting that the statutory

scheme reflects Congress's intent to "provide reduced procedural protection for discretionary

relief, the granting of which is not a matter of right under any circumstances, but rather is in all

cases a matter of grace" (cleaned up)).  This Court therefore concludes that it lacks jurisdiction to

hear Plaintiff's claims.

       That Plaintiff's complaint is brought under the APA compels no different conclusion.

*See Ying Lin v. United States Dep't of Homeland Sec.*, 699 F. App'x 44, 46 (2d Cir. 2017)

("[J]udicial review of agency action is not available under the APA where such review is limited

by another statute—here, the INA."); *see also* 5 U.S.C. § 701(a)(1); *Delgado v. Quarantillo*, 643

F.3d 52, 55 (2d Cir. 2011).  Thus, Plaintiff cannot use the APA as a runaround to this statutory

bar.

Plaintiff also argues that USCIS's decision to deny his application to adjust status was done with "illicit motives" and in "retribution" after he threatened to file a writ of mandamus. Dkt. No. 15 ¶¶ 28–29.  Plaintiff notes that while the "Government is correct in its position that USCIS has wide discretion in adjudicating an I-485[,] discretion cannot be relied upon to cover illicit motivations."  *Id.* ¶ 30.

The Court rejects this argument.  To justify discovery related to agency action in an APA case, a party must "make a 'strong preliminary showing[ ] of bad faith' or improper behavior by the agency."  *Ali v. Pompeo*, 2018 WL 2058152, at *5 (E.D.N.Y. May 2, 2018) (quoting *Nat'l Nutritional Foods Ass'n v. Food & Drug Admin., U. S. Dep't of Health, Ed. & Welfare*, 491 F.2d 1141, 1145 (2d Cir. 1974)).  "'[N]aked assertions of bad faith' are insufficient."  *Id.* (quoting *Citizens Against Casino Gambling In Erie Cty. v. Stevens*, 814 F.Supp.2d 261, 265 (W.D.N.Y. 2011)).  "Thus, a party must make a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of bad faith or an incomplete record."  *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (cleaned up).  In the case at hand, Plaintiff's assertion of bad faith is largely unsupported and far from significant.  Although Plaintiff claims that USCIS acted in bad faith after he threatened mandamus review, Plaintiff's only evidence of bad faith on the part of USCIS appears to be that the agency ultimately denied his application for adjustment of status.  These "assertions are insufficient to create the record necessary to infer there was bad faith conduct."  *Hadwan v. United States Dep't of State*, 340 F. Supp. 3d 351, 357 (S.D.N.Y. 2018).

## CONCLUSION

The motion to dismiss is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 9.

SO ORDERED.

Dated: January 3, 2023
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge